## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

WILLIAM BEAUMONT HOSPITAL,

      Plaintiff/Counter-Defendant,

                            Case No. 11-15528

v.                              Hon. Gerald E. Rosen

FEDERAL INSURANCE COMPANY,

      Defendant/Counter-Plaintiff.

_____/

## OPINION AND ORDER GRANTING
## PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____ March 13, 2013 _____

PRESENT:  Honorable Gerald E. Rosen
                  Chief Judge, United States District Court

## I.  INTRODUCTION

Plaintiff William Beaumont Hospital commenced this action in this Court on

December 18, 2011, seeking a declaration that the Defendant insurer, Federal Insurance

Company, is obligated to defend Plaintiff in a pending antitrust suit brought in this Court

against Plaintiff and other Detroit-area hospitals, and that Defendant also is obligated to

provide indemnification coverage to Plaintiff in connection with a settlement it recently

reached with the plaintiffs in the underlying antitrust suit.  Defendant, for its part, has

asserted a counterclaim against Plaintiff, seeking a declaration that it owes no duty to

defend or indemnify Plaintiff under the terms of the insurance policy it issued to Plaintiff.

This Court's subject matter jurisdiction over this suit rests upon the diverse citizenship of the parties. *See* 28 U.S.C. § 1332(a).

Through the present motion filed on March 21, 2012, Plaintiff now seeks a judgment in its favor on the pleadings, arguing that the allegations of the complaint, answer, and counterclaim, along with the exhibits accompanying these pleadings, establish as a matter of law (i) that Plaintiff's settlement of the underlying antitrust suit qualifies as a "loss" under the policy issued by Defendant, and (ii) that there is no exclusion in the policy that would overcome Defendant's obligation to indemnify Plaintiff for this loss. In response, Defendant contends (i) that outstanding issues of fact preclude this Court from determining as a matter of law whether Plaintiff's settlement of the antitrust suit constitutes a "loss" under the policy, and (ii) that the relief sought by the plaintiffs in the underlying antitrust suit triggers language in a policy endorsement dictating that the amount paid by Plaintiff to settle this suit is not a covered "loss."

Plaintiff's motion has been fully briefed by the parties.[1]  Having reviewed the parties' briefs in support of and opposition to Plaintiff's motion, as well as the accompanying exhibits and the remainder of the record, the Court finds that the relevant allegations, facts, and legal arguments are adequately presented in these written

---

[1]Beyond the customary round of initial, response, and reply briefs, Defendant has requested leave to file a surreply in response to Plaintiff's reply brief.  Because the issues before the Court are fairly straightforward, and because Plaintiff's reply brief does not raise any new arguments or unduly expand upon the contentions advanced in Plaintiff's initial brief and addressed in Defendant's response brief, the Court finds no basis for departing from the usual briefing process established under Local Rule 7.1(e) of this District.

submissions, and that oral argument would not aid the decisional process.  Accordingly,

the Court will decide Plaintiff's motion "on the briefs."  *See* Local Rule 7.1(f)(2), U.S.

District Court, Eastern District of Michigan.  For the reasons set forth below, the Court

finds that Plaintiff's motion should be granted.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Pertinent Policy Terms

On July 31, 2007, Defendant Federal Insurance Company issued Executive

Protection Policy No. 8801-8892 (the "Policy") to Plaintiff William Beaumont Hospital,

with a policy term of April 1, 2007 to April 1, 2008.  (*See* Defendant's Response, Ex. 2.B,

Executive Protection Policy.)  As a general matter, the Policy provides coverage to

Plaintiff for "all **Loss** for which the **Insured** becomes legally obligated to pay on account

of any **Claim** first made against the **Insured** during the **Policy Period** . . . for a **Wrongful**

**Act** committed, attempted, or allegedly committed or attempted, by an **Insured** before or

during the **Policy Period.**"  (*Id.* at 3.)[2]

Under Endorsement No. 10 to the Policy, Plaintiff was expressly provided

coverage for "**Claims** for **Antitrust Activities.**"  (*See* Plaintiff's Motion, Ex. A,

Endorsement No. 10.)  This endorsement calls for Defendant to pay on behalf of Plaintiff

the "**Covered Percentage** . . . of **Loss,** including **Defense Expenses,** from each **Antitrust**

---

[2]The terms appearing in bold are defined elsewhere in the Policy.

3

**Claim** first made against an **Insured** during the **Policy Period**." (*Id.* at 1.)[3]  Under this

endorsement, "Antitrust Activity" is defined as

> any actual or alleged . . . price fixing; restraint of trade; monopolization;
> unfair trade practices; or violation of the Federal Trade Commission Act,
> the Sherman Act, the Clayton Act, or any other federal statu[t]e involving
> antitrust, monopoly, price fixing, price discrimination, predatory pricing or
> restraint of trade activities, or of any rules or regulations promulgated under
> or in connection with any of the foregoing statu[t]es, or of any similar
> provision of any federal, state or local statute, rule or regulation or common
> law.

(*Id.* at 2.)

The principal point of dispute in this case involves the Policy's definition of

"Loss."  This term is defined generally as "the total amount which any **Insured** becomes

legally obligated to pay on account of each **Claim** and for all **Claims** in each **Policy**

**Period** . . . made against them for **Wrongful Acts** for which coverage applies, including,

but not limited to, damages, judgments, settlements, costs and **Defense Costs**." (Policy at

9.)  Under Endorsements No. 28 and No. 31 to the Policy, the definition of "Loss" was

amended to include "the multiple portion of any multiplied damage award." (Policy,

Endorsement No. 28, ¶ 7(a); Endorsement No. 31, ¶ 7(a).)  Endorsement No. 31 further

provides:

> Solely with respect to any **Claim** based upon, arising from or in
> consequence of profit, remuneration or advantage to which an **Insured** was
> not legally entitled, the term **Loss** . . . shall not include disgorgement by any

---

[3]The "Covered Percentage" is defined in this endorsement as 80 percent.  Defendant's
obligation under this endorsement is triggered only after Plaintiff satisfies a $1 million retention,
and Defendant's liability under this endorsement is limited to $25 million.

**Insured** or any amount reimbursed by any **Insured Person.**

(Endorsement No. 31, ¶ 6.)

## B.    The Underlying *Cason-Merenda* Antitrust Litigation

The insurance coverage dispute in this case concerns the obligation of the Defendant insurer to indemnify Plaintiff for a settlement it has reached with the plaintiffs in an antitrust suit presently pending before this Court, *Cason-Merenda v. Detroit Medical Center, et al.,* Case No. 06-15601.  As the Court explained in a recent ruling on the defendants' summary judgment motions, the plaintiffs in *Cason-Merenda* are registered nurses ("RNs") who "seek to recover on behalf of themselves and a class of RNs against eight Detroit-area hospitals, alleging that the [d]efendant health care providers have violated § 1 of the federal Sherman Act, 15 U.S.C. § 1, by (i) conspiring among themselves and with other local hospitals to hold down the wages of RNs employed by these institutions, and (ii) exchanging compensation-related information among themselves in a manner that has reduced competition among Detroit-area hospitals in the wages paid to RNs."  *Cason-Merenda v. Detroit Medical Center,* 862 F. Supp.2d 603, 605 (E.D. Mich. 2012).

In their third corrected class action complaint filed on June 15, 2007,[4] the *Cason-Merenda* plaintiffs allege that the defendant hospitals "have for years conspired among themselves and with other hospitals in the Detroit [area] to depress the compensation

---

[4]This is the operative complaint from the *Cason-Merenda* litigation, because this pleading named Plaintiff Beaumont as a defendant for the first time.

5

levels of registered nurses ('RNs') employed at the conspiring hospitals, in violation of the Sherman Act, 15 U.S.C. § 1." (*Cason-Merenda v. Detroit Medical Center,* No. 06-15601, Third Corrected Class Action Complaint at ¶ 1.) This conspiracy, according to the complaint, was facilitated by an agreement among the defendant hospitals and their alleged co-conspirators "to regularly exchange detailed and non-public information about the compensation each is paying or will pay to its RN employees." (*Id.* at ¶ 2.) Apart from this alleged conspiracy to depress the level of RN compensation, the plaintiffs further allege that this "exchange of information itself has suppressed competition among Detroit-area hospitals in the compensation of RN employees, and has depressed the compensation they have paid to such employees, in violation of Section 1 of the Sherman Act." (*Id.*)[5] Thus, the plaintiffs state that they, on their own behalf and on behalf of a class of RNs "employed by any defendant or co-conspirator to work in a hospital in the Detroit [area] as an RN at any time from December 12, 2002 until the present," seek to "recover for the compensation properly earned by RNs employed at Detroit-area hospitals but unlawfully retained by such hospitals as a result of the conspiracy alleged herein." (*Id.* at ¶¶ 4, 21.)

The *Cason-Merenda* plaintiffs allege that they "have suffered substantial economic

---

[5]In the Court's recent summary judgment ruling in *Cason-Merenda,* the defendant hospitals were awarded summary judgment in their favor on the plaintiffs' claim of a *per se* violation of § 1 of the Sherman Act arising from the defendants' alleged conspiracy to depress RN compensation levels, but the plaintiffs were permitted to go forward on their § 1 "rule of reason" claim that the defendant hospitals had unlawfully agreed among themselves to share compensation information in a manner that harmed competition and depressed RN wages. *See Cason-Merenda,* 862 F. Supp.2d at 641, 647-49.

harm in the form of lost compensation as a direct result of defendants' and their co-conspirators' unlawful agreement to depress RN compensation and their unlawful agreement to exchange RN compensation information." (*Id.* at ¶ 49.) They further allege, under each of the two counts of their complaint, that they and the other members of the putative class "have been injured in their business or property by receiving artificially depressed compensation during and before the Class period." (*Id.* at ¶¶ 53, 69.) As relief for the two § 1 violations asserted in their complaint, the *Cason-Merenda* plaintiffs request a declaration that the defendants' actions violated § 1 of the Sherman Act, and they and the other members of the putative class also seek to "recover their damages against each defendant, jointly and severally," with this damage award to "be trebled pursuant to 15 U.S.C. § 15(a)." (*Id.,* Prayer for Relief ¶¶ B, C.) Finally, the plaintiffs request that they "and the other members of the Class be granted such other relief deemed proper to this Court." (*Id.*, Prayer for Relief ¶ F.)

## C.   Plaintiff's Claims for Policy Coverage and Defendant's Responses

Upon being named as a defendant in the *Cason-Merenda* suit, Plaintiff timely reported this litigation to Defendant and requested defense and indemnity coverage under the Policy. Under a "Defense Agreement" entered into by the parties, Defendant agreed to pay the "Covered Percentage" (*i.e.,* 80 percent) of the defense costs incurred by Plaintiff in the *Cason-Merenda* litigation, subject to Defendant's reservation of its right to seek reimbursement of these payments in the event that coverage for these costs was determined to be unavailable under the Policy. (*See* Plaintiff's Motion, Ex. B, Defense

7

Agreement.)  This Defense Agreement includes a statement of Defendant's express

acknowledgment and "determin[ation] that the [*Cason-*]*Merenda* action constitutes an

'Antitrust Claim,' as defined in Endorsement No. 10 to the Policy . . . , and, as such, is

subject to the retention, sublimit, and co-insurance specified in that endorsement."  (*Id.* at

2.)

Following court-ordered settlement negotiations in late 2011 and early 2012,

Plaintiff entered into a March 20, 2012 settlement agreement and release with the *Cason-*

*Merenda* plaintiffs.  This agreement calls for Plaintiff to pay the sum of $11,342,904 into

a settlement fund within ten days after the Court enters an order preliminarily approving

this settlement.[6]  Defendant has agreed to pay 80 percent of this settlement amount,

subject to its right to recover this contribution to the extent that Plaintiff's settlement is

not a covered "loss" under the Policy.  Through the present litigation, the parties seek a

declaration as to whether Defendant does or does not have an obligation under the Policy

to defend and provide indemnity coverage to Plaintiff in connection with the claims

asserted against Plaintiff and the settlement reached by Plaintiff in the *Cason-Merenda*

antitrust litigation.

### III.  ANALYSIS

**A.     The Standards Governing Plaintiff's Motion**

---

[6]On April 20, 2012, the *Cason-Merenda* plaintiffs filed a motion for preliminary approval of the settlement reached with Plaintiff.  This motion was addressed and granted at a hearing held on March 1, 2013, and an order reflecting the Court's approval of the settlement is expected to be entered soon.

Through the present motion, Plaintiff seeks the entry of judgment in its favor on the pleadings pursuant to Fed. R. Civ. P. 12(c). A motion for judgment on the pleadings should be granted "when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *JPMorgan Chase Bank, N.A. v. Winget,* 510 F.3d 577, 582 (6th Cir. 2007) (internal quotation marks and citation omitted). When considering a motion under this Rule, "all well-pleaded material allegations [in] the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *JPMorgan Chase Bank,* 510 F.3d at 581 (internal quotation marks and citation omitted). However, the Court "need not accept as true legal conclusions or unwarranted factual inferences" put forward in the parties' pleadings. *Mixon v. Ohio,* 193 F.3d 389, 400 (6th Cir. 1999).[7]

**B.    The Award of Compensatory Damages Sought by the Plaintiffs in the *Cason-Merenda* Litigation and Reflected in Their Settlement Agreement with the Plaintiff Insured in This Case Qualifies as a Covered "Loss" Under the Policy.**

**1.     The Standards Governing the Court's Interpretation of the Policy**

To the extent that the proper disposition of Plaintiff's motion turns upon the interpretation of the terms of the Executive Protection Policy (the "Policy") issued by Defendant to Plaintiff, it is well established under Michigan law that the construction of

---

[7]As both parties observe, the Court's review is not strictly limited to the four corners of the parties' pleadings, but also extends to exhibits to these pleadings and attachments to the parties' briefs in support of and in opposition to Plaintiff's motion, so long as these materials are referenced in the parties' pleadings and are central to the claims and counterclaims asserted in this suit. *See Amini v. Oberlin College,* 259 F.3d 493, 502 (6th Cir. 2001). In particular, the Court may consider the insurance policy and related materials attached as exhibits to Defendant's answer and counterclaim.

9

an insurance policy is a question of law for the Court, provided that the policy terms at issue are not ambiguous.  *See City of Grosse Pointe Park v. Michigan Municipal Liability & Property Pool,* 473 Mich. 188, 702 N.W.2d 106, 112 (2005); *Klapp v. United Insurance Group Agency, Inc.,* 468 Mich. 459, 663 N.W.2d 447, 451, 453-54 (2003).[8] Moreover, "[t]he principles of construction governing other contracts apply to insurance policies," and "[w]here no ambiguity exists, this Court enforces the contract as written." *Farm Bureau Mutual Insurance Co. v. Nikkel,* 460 Mich. 558, 596 N.W.2d 915, 919 (1999).  The language of an insurance policy, like that of other contracts, should be given "its plain and ordinary meaning, avoiding technical and constrained constructions." *English v. Blue Cross Blue Shield of Michigan,* 263 Mich. App. 449, 688 N.W.2d 523, 537 (2004).  "Absent an ambiguity or internal inconsistency, contractual interpretation begins and ends with the actual words of a written agreement."  *Universal Underwriters Insurance Co. v. Kneeland,* 464 Mich. 491, 628 N.W.2d 491, 494 (2001).

---

[8]The parties here evidently agree, at least tacitly, that Michigan law governs this Court's inquiry into the proper interpretation of the Policy.

10

2. **The Plaintiffs in the *Cason-Merenda* Litigation Have Not Pursued the Remedy of Disgorgement, Such That Plaintiff's Settlement Payment in *Cason-Merenda* Could Be Viewed as Excluded from the Policy's Definition of Covered "Loss."**

The question presented for resolution in this case is quite narrow. Defendant does not deny that the Sherman Act antitrust claims asserted against Plaintiff in the *Cason-Merenda* litigation qualify as "Claims for Antitrust Activities" within the meaning of Endorsement No. 10 to the Policy. As observed earlier, this endorsement defines "Antitrust Activity" as including "any actual or alleged[] price fixing; restraint of trade; . . . or violation of . . . the Sherman Act," (Plaintiff's Motion, Ex. A, Endorsement No. 10 at 2), and the Sherman Act violations alleged by the plaintiffs in *Cason-Merenda* clearly are encompassed within this definition, as Defendant has acknowledged, (*see* Plaintiff's Motion, Ex. B, Defense Agreement at 2). Instead, the sole ground identified by Defendant for denying that Plaintiff is entitled to coverage under the Policy in connection with its defense and settlement of the *Cason-Merenda* litigation is that the relief sought by the *Cason-Merenda* plaintiffs and embodied in Plaintiff's settlement of that litigation lies outside the Policy's definition of a covered "loss." As discussed below, the Court finds that Defendant's position on this subject is defeated as a matter of law by the parties' pleadings, the accompanying, undisputed record, and the law governing claims brought under § 1 of the Sherman Act.

The Policy generally defines "loss" as "the total amount which any **Insured** becomes legally obligated to pay on account of each **Claim** and for all **Claims** in each

11

**Policy Period** . . . made against them for **Wrongful Acts** for which coverage applies,

including, but not limited to, damages, judgments, settlements, costs and **Defense Costs.**"

(Defendant's Response, Ex. 2.B, Executive Protection Policy at 9.)  Endorsement No. 31

to the Policy, however, limits this definition of "loss" as follows:

> Solely with respect to any **Claim** based upon, arising from or in
> consequence of profit, remuneration or advantage to which an **Insured** was
> not legally entitled, the term **Loss** . . . shall not include disgorgement by any
> **Insured** or any amount reimbursed by any **Insured Person.**

(Policy, Endorsement No. 31, ¶ 6.)  In Defendant's view, the claims asserted in *Cason-*

*Merenda* can be viewed, at least in part, as "based upon, arising from or in consequence

of profit, remuneration or advantage to which [the defendant hospitals] w[ere] not legally

entitled," and the relief sought by the plaintiffs in that case — as well as the settlement

amount that Plaintiff has agreed to pay — incorporates at least an element of

"disgorgement and/or restitutionary relief."  (Defendant's Response Br. at 24.)  It follows,

according to Defendant, that its obligation under the Policy does not encompass any

portion of Plaintiff's settlement amount that is properly characterized as the purported

"disgorgement and/or restitutionary relief" sought by the *Cason-Merenda* plaintiffs.

Defendant's argument, however, rests upon an untenable reading of the complaint

in *Cason-Merenda,* and is inconsistent with the law governing the antitrust claims

asserted in that litigation.  In arguing that the *Cason-Merenda* plaintiffs have sought the

relief of disgorgement or restitution, Defendant cites two passages from the complaint in

that case:  (i) an allegation near the outset of the complaint that the plaintiffs "seek to

recover for the compensation properly earned by RNs employed at Detroit-area hospitals but unlawfully retained by such hospitals as a result of the conspiracy alleged herein," (*Cason-Merenda v. Detroit Medical Center,* No. 06-15601, Third Corrected Class Action Complaint at ¶ 4), and (ii) an allegation that the members of the putative plaintiff class "have suffered substantial economic harm in the form of lost compensation as a direct result of defendants' and their co-conspirators' unlawful agreement to depress RN compensation and their unlawful agreement to exchange RN compensation information," (*id.* at ¶ 49). According to Defendant, these allegations of "lost" and "unlawfully retained" compensation necessarily give rise to a restitutionary remedy — namely, an order or award mandating that the defendant hospitals return to the plaintiff class members the compensation that has been withheld from them.

This proposed reading of the *Cason-Merenda* complaint suffers from a number of flaws, each of which suffices to defeat Defendant's argument. First, the more narrow definition of "loss" found in Endorsement No. 31 to the Policy applies only to claims "based upon, arising from or in consequence of profit, remuneration or advantage to which [Plaintiff] was not legally entitled." (Policy, Endorsement No. 31, ¶ 6.) Yet, the claims asserted against Plaintiff in *Cason-Merenda* arise under § 1 of the Sherman Act, 15 U.S.C. § 1, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." As the Sixth Circuit has stated:

> [T]o establish a claim under section 1, the plaintiff must establish that the

13

> defendants contracted, combined or conspired among each other, that the
> combination or conspiracy produced adverse, anti-competitive effects
> within relevant product and geographic markets, that the objects of and
> conduct pursuant to that contract or conspiracy were illegal and that the
> plaintiff was injured as a proximate result of that conspiracy.

*Expert Masonry, Inc. v. Boone County, Ky.,* 440 F.3d 336, 342 (6th Cir. 2006) (internal

quotation marks and citations omitted).  The crux of a § 1 claim, in other words, is an

agreement with anti-competitive effects that injures the plaintiff, without regard to

whether the defendant conspirators secured any profit, advantage, or ill-gotten gains as a

result of their agreement.  Thus, for example, the Supreme Court has observed that

"nonprofit organizations can be held liable under the antitrust laws."  *American Society of*

*Mechanical Engineers, Inc. v. Hydrolevel Corp.,* 456 U.S. 556, 576, 102 S. Ct. 1935,

1948 (1982); *see also Goldfarb v. Virginia State Bar,* 421 U.S. 773, 785, 95 S. Ct. 2004,

2012 (1975) (explaining that it was not "necessary for petitioners to prove that the fee

schedule [set by the respondent bar association] raised fees," and that it was enough that

this fee schedule "fixed fees and thus deprived purchasers or consumers of the advantages

which they derive from free competition" (internal quotation marks, alteration, and

citations omitted)).

Viewed against this backdrop of antitrust law, the passing reference in the 17-page,

69-paragraph *Cason-Merenda* complaint to compensation "unlawfully retained" by the

defendant hospitals cannot bear the weight that Defendant seeks to give to this language.

To establish the § 1 claims asserted in this complaint, the *Cason-Merenda* plaintiffs need

not show that Plaintiff and the other defendant hospitals obtained a "profit, remuneration

14

or advantage to which [they] w[ere] not legally entitled." (Endorsement No. 31, ¶ 6.) And, in fact, they make no such allegations in either of the two counts of their complaint. Instead, these counts rest upon allegations of conspiracies that injured the plaintiff RNs, with complaints of an agreement to depress RN compensation and an agreement to exchange compensation information that resulted in suppressed competition among Detroit-area hospitals in the compensation of their RNs. The Michigan Supreme Court has emphasized that "an insurer's duty to defend and indemnify does not depend solely upon the terminology used in a plaintiff's pleadings," and that "it is necessary to focus on the basis for the injury and not the nomenclature of the underlying claim in order to determine whether coverage exists." *Allstate Insurance Co. v. Freeman,* 432 Mich. 656, 443 N.W.2d 734, 737 (1989) (internal quotation marks and citation omitted). Applying these principles here, the Court fails to see how the § 1 conspiracy claims asserted in the *Cason-Merenda* complaint could fairly be construed as claims "based upon, arising from or in consequence of profit, remuneration or advantage to which [Plaintiff] was not legally entitled," as necessary to trigger the Policy's narrower definition of "loss."

Even assuming, however, that this definition of "loss" were to apply to the claims asserted in *Cason-Merenda,* Defendant acknowledges that this definition excludes coverage only if these claims serve as a vehicle for the relief of "disgorgement." (*See* Defendant's Response Br. at 7 (explaining that "as made explicit by Endorsement 31 to the Policy, 'Loss' does <u>not</u> include disgorgement of ill-gotten gains").) While the *Cason-Merenda* complaint could perhaps be viewed as alluding to notions of disgorgement or

15

restitution through its single reference to compensation earned by the plaintiff RNs but "unlawfully retained" by the defendant hospitals, the brute fact remains that no such request for disgorgement or restitution can be found anywhere in the complaint's prayer for relief.[9]  Rather, this portion of the complaint speaks only of the plaintiffs "recover[ing] their damages against each defendant, jointly and severally, in an amount to be determined," with this damage award subject to trebling under 15 U.S.C. § 15(a). (*Cason-Merenda v. Detroit Medical Center,* No. 06-15601, Third Corrected Class Action Complaint, Prayer for Relief ¶ C.)  If the plaintiffs in *Cason-Merenda* truly seek the remedies of disgorgement or restitution, they certainly have failed to make this intention clear in the portion of their complaint dedicated to enumerating their requested relief.

To be sure, Defendant points to the catchall request in the complaint's prayer for relief that the plaintiffs be "granted such other relief deemed proper to this Court," (*id.*, Prayer for Relief ¶ F), and it contends that this language is broad enough to encompass

---

[9]The Court notes that throughout its response to Plaintiff's motion, Defendant interchangeably refers to "disgorgement" and "restitution" as equally beyond the scope of the coverage provided in Endorsement No. 31's definition of "loss."  (*See, e.g.,* Defendant's Response Br. at 23 (arguing that the *Cason-Merenda* complaint seeks the relief of "disgorgement/restitution . . . in at least two places").  In point of fact, however, this definition of "loss" draws a distinction between "disgorgement by any **Insured**"and "any amount reimbursed by any **Insured Person.**"  (Policy, Endorsement No. 31, ¶ 6.)  The Policy elsewhere clarifies that, as one might expect, an "insured person" encompasses only individuals, such as the corporate officers and directors of an insured organization.  (*See* Policy, Endorsement No. 12.)  Thus, even assuming that the reference in Endorsement No. 31 to "reimburse[ment]" could be construed as encompassing the remedy of restitution, an amount paid by the corporate entity itself (here, Plaintiff Beaumont), as opposed to an individual, presumably would be excluded from coverage only if it qualified as the remedy of "disgorgement."  As Defendant acknowledges, the remedies of disgorgement and restitution, while perhaps related, nonetheless "differ somewhat in their focus."  (Defendant's Response Br. at 19 n.50.)

the remedies of disgorgement or restitution.  Again, however, such a reading of the

complaint would run afoul of both the record and the pertinent principles of antitrust law.

The Supreme Court has emphasized that "the antitrust private action was created

primarily as a remedy for the victims of antitrust violations."  *American Society of*

*Mechanical Engineers,* 456 U.S. at 575, 102 S. Ct. at 1947.  Thus, the courts have

observed that the damages awardable to a private plaintiff for a Sherman Act violation

"should be construed in the ordinary common law context as compensating plaintiff in

full for the preventable and established loss sustained by reason of tortious or proscribed

acts."  *Albrecht v. Herald Co.,* 452 F.2d 124, 127-28 (8th Cir. 1971); *see also Fishman v.*

*Estate of Wirtz,* 807 F.2d 520, 551 (7th Cir. 1986).

The record in *Cason-Merenda* reflects this compensatory goal of a private antitrust

action.  First, and most significantly, the Court has already observed that the complaint in

that case lacks any plea for disgorgement or restitution of any ill-gotten gains secured by

the defendant hospitals as a result of their alleged conspiracy.  Likewise, nothing in the

record compiled in the course of the *Cason-Merenda* litigation supports the notion that

the plaintiffs in that case seek to measure their damages by reference to the profits

obtained by the defendant hospitals.  To the contrary, the damage expert retained by the

*Cason-Merenda* plaintiffs, Dr. Orley Ashenfelter, has computed the injury to the plaintiff

RN class by calculating the difference between the actual earnings of these class members

during the class period and the "but-for" earnings these RNs would have been paid in the

absence of the alleged conspiracy.  (*See Cason-Merenda v. Detroit Medical Center,* No.

06-15601, Ashenfelter 11/24/2008 Expert Report at ¶¶ 107-23.)[10]  These "but-for"

earnings are determined not by resort to the profits (if any) of the defendant hospitals, but

rather are computed by comparison to the fees paid by the defendant hospitals to obtain

RNs from outside agencies.  (*See id.* at ¶¶ 107, 116.)  This is an ordinary "yardstick"

measure employed in private antitrust suits to compensate the plaintiffs for their

competitive injury, which seeks to put the plaintiffs in the position they would have

enjoyed in the "hypothetical free market" that would have existed if not for the

defendant's antitrust violation.  *Fishman,* 807 F.2d at 551.  Nothing in this damage

calculation depends in any way on any measure or estimate of the profits or other

financial advantage gained by the defendant hospitals as a result of their alleged

conspiracy.[11]  It follows that the remedy sought in *Cason-Merenda* cannot be viewed as

_____

[10]The Court notes that in deciding Plaintiff's motion, it may take judicial notice of Dr. Ashenfelter's expert report, which has been submitted to the Court and filed on the docket in the related *Cason-Merenda* litigation.  *See, e.g., Lyons v. Stovall,* 188 F.3d 327, 332 n.3 (6th Cir. 1999); *E.I. du Pont de Nemours & Co. v. Cullen,* 791 F.2d 5, 7 (1st Cir. 1986).  This judicial notice, of course, does not extend to the truth of the matters asserted in Dr. Ashenfelter's report, *see Opoka v. I.N.S.,* 94 F.3d 392, 395 (7th Cir. 1996), but rather only to the fact of the analytical approach he uses to compute the damages suffered by the plaintiff class in that case.

[11]Indeed, as Plaintiff points out, the plaintiffs in *Cason-Merenda* seek to hold the defendant hospitals "jointly and severally" liable for the damages they allegedly suffered. (*Cason-Merenda v. Detroit Medical Center,* No. 06-15601, Third Corrected Class Action Complaint, Prayer for Relief ¶ C.)  Thus, if the plaintiffs were to prevail on their § 1 antitrust conspiracy claim, they could choose to collect the entirety of the judgment from Plaintiff or some other defendant hospital alone, and this defendant would have no recourse under antitrust law to seek contribution from any other co-defendant hospital.  *See Texas Industries, Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 645-46, 101 S. Ct. 2061, 2069-70 (1981).  This belies the notion that Plaintiff faces only the disgorgement of its own profit or advantage secured as a result of its participation in the alleged conspiracy.  *See State of Washington v. American Pipe & Construction Co.,* 280 F. Supp. 802, 805 (S.D. Cal. 1968) (observing that an antitrust conspirator "must share the responsibility for any damages proved which were occasioned by the sales of co-

"disgorgement" of any such profit.  *See Gavriles v. Verizon Wireless,* 194 F. Supp.2d 674, 681 (E.D. Mich. 2002) (explaining that "[d]isgorgement is an equitable remedy to force a defendant to give up the amount equal to the defendant's unjust enrichment," and "is not intended to compensate the victim of fraud").[12]

The Court further concludes that the settlement for which Plaintiff seeks coverage, like the other settlements achieved to date in the *Cason-Merenda* litigation, is wholly consistent with this focus on the injury suffered by the plaintiff RNs, as opposed to the defendant hospitals' profits or ill-gotten gains.  The settlement amount to be paid by Plaintiff will be distributed among the entire plaintiff class, and this amount — like the amounts paid to date by three other settling defendant hospitals in *Cason-Merenda* — rests upon a formula representing approximately two percent of the total wages paid by Plaintiff to its RNs during the class period.  (*See Cason-Merenda v. Detroit Medical Center,* No. 06-15601, Plaintiffs' 4/20/2012 Motion for Preliminary Approval, Br. in Support at 9.)  Once again, nothing in this settlement formula purports to measure the

---

conspirators, even though it may not have directly participated in, or benefited from, such activity").

[12]In light of this conclusion that the *Cason-Merenda* plaintiffs have not sought the remedy of disgorgement, the Court need not weigh in on the parties' debate as to whether this remedy is even available in a private Sherman Act antitrust suit.  As Plaintiff observes, the authorities cited by Defendant as purportedly establishing the availability of this remedy either address governmental enforcement actions, *see United States v. Keyspan Corp.,* 763 F. Supp.2d 633, 638-41 (S.D.N.Y. 2011); *In re TFT-LCD (Flat Panel) Antitrust Litigation,* No. M 07-1827, 2011 WL 2790179, at *3-*4 (N.D. Cal. July 12, 2011); *Phillip E. Areeda et al., Antitrust Law* ¶ 325a (3d ed. 2007), or touch upon this topic only in passing, *see Black v. JP Morgan Chase & Co.,* No. 10-848, 2011 WL 3940236, at *21 (W.D. Pa. Aug. 25, 2011).

profit or financial advantage gained by Plaintiff as a result of its alleged § 1 violation. Rather, this formula, like Dr. Ashenfelter's underlying estimate of damages suffered by the plaintiff RN class, treats all (or almost all) of the class as having been "underpaid relative to a conservative benchmark of competitive compensation," (*see Cason-Merenda v. Detroit Medical Center,* No. 06-15601, Ashenfelter 11/24/2008 Expert Report at ¶ 107), with the settlement amount being used to compensate the entirety of the class for a portion of this aggregate underpayment of wages by all of the defendant hospitals during the class period. Accordingly, the Court finds that the terms of the settlement reached by Plaintiff in the *Cason-Merenda* litigation, like the other pertinent portions of the record compiled in the course of that underlying litigation, fail to evidence any "disgorgement" by Plaintiff that would be excluded from the term "loss" as defined in Endorsement No. 31 to the Policy.

In a final effort to avoid this conclusion, Defendant points to the Seventh Circuit's decision in *Level 3 Communications, Inc. v. Federal Insurance Co.,* 272 F.3d 908 (7th Cir. 2001), for the broad proposition that "coverage for restitution or disgorgement is uninsurable as a matter of public policy." (Defendant's Response Br. at 25.) This case, however, is inapposite here on a number of grounds. First, Defendant need not identify any sort of public policy basis for reading the Policy as excluding the remedy of disgorgement from its definition of "loss." Rather, the ***Policy itself*** makes this exclusion, through its express language in Endorsement No. 31 providing that a covered loss "shall not include disgorgement by any **Insured.**" Accordingly, to the extent that the Seventh

20

Circuit recognizes an "interpretive principle" that "a 'loss' within the meaning of an insurance contract does not include the restoration of an ill-gotten gain," *Level 3 Communications,* 272 F.3d at 910, the Policy here already incorporates this principle, without the need for any sort of judicial construction.  Even if it were necessary to resort to such an "interpretative principle" in construing the Policy's definition of "loss," the Seventh Circuit's recognition of this principle rests on citations to case law from a number of states, with Michigan not among them.  *See Level 3 Communications,* 272 F.3d at 910 (collecting cases).  While Defendant faults Plaintiff for failing to "identify a single Michigan or Sixth Circuit case holding that disgorgement and restitution payments are insurable in Michigan," (Defendant's Response Br. at 27), Defendant has likewise failed to identify any such case holding that these remedies are ***not*** insurable under Michigan law, or adopting an "interpretative principle" of the sort applied in *Level 3 Communications,* (*see id.* at 26 n.59 (stating only that "there is good reason to anticipate that Michigan would follow this majority approach")).  Nor has Defendant endeavored to explain why it should be Plaintiff's burden to establish a Michigan public policy against insurance coverage that otherwise, under the terms of a policy, would encompass disgorgement or "the restoration of an ill-gotten gain."

In any event, the Court has already explained that the coverage sought by Plaintiff here does not run afoul of the interpretative principle addressed in *Level 3 Communications.*  In that case, the court described the underlying suit giving rise to the coverage issue as based upon a claim that the insured/underlying defendant, Level 3, had

21

"obtained the plaintiffs' company by false pretenses," with the plaintiffs having "sought to rescind the transaction and recover their shares, or rather the monetary value of the shares because their company can no longer be reconstituted." *Level 3 Communications*, 272 F.3d at 910. The court reasoned that this relief was "restitutionary in character," as "[i]t seeks to divest the defendant of the present value of the property obtained by fraud, minus the cost to the defendant of obtaining the property." 272 F.3d at 910-11. In the court's view, this relief was "equivalent to seeking to impress a constructive trust on the property in favor of the rightful owner." 272 F.3d at 911. Against this backdrop, the court concluded that "[a]n insured incurs no loss within the meaning of the insurance contract by being compelled to return property that it had stolen, even if a more polite word than 'stolen' is used to characterize the claim for the property's return." 272 F.3d at 911.

For reasons already explained, the claims brought against Plaintiff in the *Cason-Merenda* litigation, and the relief sought by the plaintiffs in that case, do not meet this description of an effort (i) to divest the defendant hospitals of property that properly belongs to the plaintiff RNs, (ii) to impress a constructive trust on property in favor of its rightful owners, the class members, or (iii) to compel the hospitals to return property they have effectively "stolen" from the plaintiff RNs. Rather, the *Cason-Merenda* plaintiffs are seeking ordinary compensatory damages for injuries they claim to have suffered as a result of the purportedly anti-competitive effects of the defendant hospitals' allegedly conspiratorial conduct in violation of § 1 of the Sherman Act.

22

As Plaintiffs observe, other courts have distinguished *Level 3 Communications* on precisely this ground.  In *Genzyme Corp. v. Federal Insurance Co.,* 622 F.3d 62, 70 (1st Cir. 2010), for example, the court found that "[t]his case does not present an unjust enrichment situation" to which *Level 3 Communications* would apply, where the defendant "obtained no identifiable asset in the share exchange" transaction challenged by the plaintiffs in an underlying shareholder class action, and "therefore the settlement payment [in this underlying suit] cannot represent the restoration to the plaintiffs of some amount [the defendant] had improperly taken and withheld."  Similarly, in *Virginia Mason Medical Center v. Executive Risk Indemnity, Inc.,* No. 07-0636, 2007 WL 3473683, at *3 (W.D. Wash. Nov. 14, 2007), *aff'd,* 331 F. App'x 473 (9th Cir. May 26, 2009), the court held that a Washington Consumer Protection Act claim brought against the plaintiff medical center, Virginia Mason, in an underlying suit "did not seek to prevent unjust enrichment or to deprive Virginia Mason of the 'net benefit' of its allegedly wrongful act."  Rather, the court observed that the settlement in this underlying suit "was calculated by determining the individual harm suffered by each plaintiff" in that suit, and "not by assessing Virginia Mason's gain."  *Virginia Mason Medical Center,* 2007 WL 3473683, at *3; *see also Chubb Custom Insurance Co. v. Grange Mutual Casualty Co.,* No. 07-1285, 2011 WL 4543896, at *11 (S.D. Ohio Sept. 29, 2011) (reasoning that the plaintiff insurer's "reliance on *Level 3 Communications* and other similar cases is misplaced," because "the substance of the plaintiffs' claims in the [underlying suits giving rise to a coverage dispute] was for damages, not restitution").

23

Viewed in this proper context, and in light of the record in this case, Defendant's appeal to *Level 3 Communications* is simply a Procrustean effort to deprive Plaintiff of the antitrust coverage that it plainly bargained and paid for.  Endorsement No. 10 to the Policy explicitly provides coverage for "**Claims** for **Antitrust Activities.**"  (Plaintiff's Motion, Ex. A, Endorsement No. 10.)  As noted earlier, Defendant has expressly acknowledged in a Defense Agreement with Plaintiff that "the [*Cason-]Merenda* action constitutes an 'Antitrust Claim,' as defined in Endorsement No. 10 to the Policy . . . , and, as such, is subject to the retention, sublimit, and co-insurance specified in that endorsement."  (Plaintiff's Motion, Ex. B, Defense Agreement at 2.)  In addition, the Court has explained that the relief sought by the *Cason-Merenda* plaintiffs consists of the ordinary compensatory damages awardable in a private antitrust suit alleging violations of § 1 of the Sherman Act — a damage award that focuses on injury to the plaintiffs rather than gain to the defendant hospitals.  Yet, Defendant nonetheless contends that this traditional damage award sought in the *Cason-Merenda* litigation includes at least an element of "disgorgement" that is ineligible for coverage as a "loss," whether under Endorsement No. 31's definition of this term or under the reasoning of *Level 3 Communications.*

As one court has aptly observed, it would be problematic and "contradictory" to offer coverage for a specific type of statutory claim — such as the Sherman Act coverage offered under Endorsement No. 10 to the Policy — but then to withhold coverage for "the damages resulting" from such a claim.  *Foster v. D.B.S. Collection Agency,* No. 01-514,

24

2008 WL 755082, at *14 (S.D. Ohio March 20, 2008).  This, however, is precisely the result advocated by Defendant here.  This illusory, sleight-of-hand view of policy "coverage," with one clause taking away what another promises to provide, is truly a position that only an insurer (and its lawyer) could embrace.  If the Court were to accept Defendant's argument on this point, surely the only "profit, remuneration or advantage" that would (or should) be subject to disgorgement would be the policy premiums paid by Plaintiff to Defendant for apparent antitrust coverage that would prove unavailable in even a garden-variety Sherman Act suit.

In the end, however, the Court need not confront this concern of illusory coverage, because it finds ample basis for rejecting Defendant's proposed reading of the Policy as denying coverage for the *Cason-Merenda* litigation.  For reasons already explained, the Court simply does not view the complaint in *Cason-Merenda* as asserting any "**Claim** based upon, arising from or in consequence of profit, remuneration or advantage to which [Plaintiff] was not legally entitled."  (Policy, Endorsement No. 31, ¶ 6.)  Neither does the Court view the record in *Cason-Merenda* as reflecting that the plaintiffs in that case seek the remedy of disgorgement from Plaintiff and the other defendant hospitals.  While the *Cason-Merenda* complaint makes passing reference to RN compensation "unlawfully retained" by the defendant hospitals, and while it is undoubtedly possible, as a matter of abstract, zero-sum economic theory, to assert that every additional dollar in wages the plaintiff RNs allegedly would have received but for the antitrust conspiracy alleged in this complaint is money unlawfully "withheld" or "retained" by the defendant hospitals, the

25

Court concludes that it would stretch the notion of "disgorgement" beyond all accepted meaning in the law to say that this remedy is being pursued against the defendant hospitals in the *Cason-Merenda* litigation.

### C.   No Issue of Fact or Need for Discovery Precludes the Entry of the Declaratory Judgment Sought by Plaintiff.

Apart from arguing on the merits that Plaintiff's settlement payment in the *Cason-Merenda* litigation is not a covered "loss" under the Policy, Defendant also contends, as a threshold matter, that this question is not amenable to resolution as a matter of law at the present juncture.  In particular, Defendant points to purported issues of fact arising from the parties' conflicting allegations in their pleadings, as well as matters that Defendant seeks to explore in discovery.  As discussed below, the Court finds that Defendant has failed to identify an issue of material fact arising from the parties' pleadings or potentially lurking in Defendant's pending discovery requests, and instead concludes that the coverage dispute at issue here may properly be resolved as a matter of law under the pleadings and accompanying record.

Defendant's claim of purported "factual conflicts" in the parties' pleadings warrants only brief discussion.  First and foremost, Defendant points to Plaintiff's allegation in its complaint that the *Cason-Merenda* plaintiffs "have not requested and do not advance any theory of 'disgorgement'" in this underlying litigation, (First Amended Complaint at ¶ 9), an assertion that Defendant expressly denies in its answer to the complaint and its counterclaim, (*see* Answer at ¶ 9; Counterclaim at ¶ 20).  Yet, as

Defendant acknowledges in its answer, "[t]he complaint in the *Cason-Merenda* Litigation is in writing and speaks for itself," (Answer at ¶ 9), and Defendant has not cited any authority suggesting that this Court is precluded from determining as a matter of law whether this underlying complaint pursues a remedy of disgorgement that would be ineligible for coverage as a "loss" under the Policy.  Rather, the pertinent rulings of the Michigan courts, and of federal courts applying Michigan law, indicate that the interpretation of an underlying complaint for purposes of determining policy coverage is a legal question properly addressed by the court.  *See, e.g., Freeman, supra,* 443 N.W.2d at 737 (referring to the task of "[t]he court" to look to the allegations of an underlying complaint in determining whether an insurer has a duty to provide a defense in this underlying suit); *Northland Insurance Co. v. Stewart Title Guaranty Co.,* 327 F.3d 448, 456-59 (6th Cir. 2003) (affirming a district court's ruling as a matter of law that the theories of recovery asserted and relief sought in an underlying complaint did not give rise to a duty to defend); *Keely v. Fire Insurance Exchange,* 833 F. Supp.2d 722, 726-28 (E.D. Mich. 2011) (determining as a matter of law whether the defendant insurer had a duty to provide a defense in an underlying tort suit, based on the claims asserted and allegations made in the underlying complaint).  Thus, to the extent that Defendant's answer and counterclaim include allegations as to the nature of the relief sought in the *Cason-Merenda* litigation, the Court finds that these are legal conclusions that need not

be credited or accepted as true in deciding Plaintiff's motion.[13]

Next, Defendant has failed to persuade the Court that the discovery it seeks to pursue in this action evidences material factual issues that cannot be resolved under the present record. In certain of Defendant's discovery requests, it asks Plaintiff to characterize the relief sought by the plaintiffs in the *Cason-Merenda* litigation. As explained, the Court has concluded that this is a question of law, and Plaintiff's statement of its views on this subject cannot give rise to an issue of fact. In other discovery requests, Defendant seeks details about the terms of the settlement agreement reached between Plaintiff and the *Cason-Merenda* plaintiffs. While this agreement had not yet been finalized when Plaintiff commenced the present action in December of 2011, it was subsequently executed on March 20, 2012, nearly a month before Defendant filed its April 18, 2012 response to Plaintiff's motion.[14] Despite this opportunity to review the final settlement agreement, Defendant has not explained how the terms of this agreement give rise to issues of fact that preclude the Court from resolving the parties' coverage dispute as a matter of law.

_____

[13]Defendant also identifies two other factual conflicts in the parties' pleadings, but neither concerns a material fact. First, to the extent that Plaintiff alleges (and Defendant denies) that Defendant has acted in bad faith or has failed to properly discharge its duties under the Policy, this question of Defendant's good- or bad-faith performance of its contractual duties has played no part in the disposition of Plaintiff's motion. Likewise, to the extent that the parties dispute whether Plaintiff has been permitted to control its own defense and settlement negotiations in the course of the *Cason-Merenda* litigation, this issue also is immaterial to the Court's resolution of Plaintiff's motion.

[14]Indeed, a copy of this agreement is attached as an exhibit to Defendant's response.

Finally, Defendant has propounded discovery requests directed at the method through which Plaintiff's settlement payment will be allocated and distributed among the plaintiff class members in *Cason-Merenda.* To be sure, the settlement agreement provides only that this distribution will be made "in accordance with a Plan of Allocation" that the *Cason-Merenda* plaintiffs and their counsel need only submit to the Court at some point "prior to any such distribution," (Defendant's Response, Ex. 4.A, Settlement Agreement at ¶ 46), and no such plan of allocation has yet been submitted for the Court's consideration and approval. Yet, the Court fails to see how the details of this distribution to class members — a class which, as noted above, consists of RNs employed by all of the defendant hospitals named in the *Cason-Merenda* complaint, and not just those employed by Plaintiff — might somehow affect the characterization of Plaintiff's settlement payment as compensatory or restitutionary in nature. To the contrary, and as discussed earlier, the methodology used to compute the damages allegedly suffered by the *Cason-Merenda* class members — and, in turn, used to formulate the settlement amounts paid by all but one of the settling defendant hospitals to date, including Plaintiff — is based upon "but-for" additional compensation the RN class would have received if not for the defendant hospitals' alleged Sherman Act violations, rather than considerations of the hospitals' profits or ill-gotten gains. Defendant has not endeavored to explain how the choice of a particular means for distributing these damages or settlement payments could somehow convert a compensatory remedy into a disgorgement of hospital profits. Accordingly, this discovery effort, like the others identified by Defendant, does not raise

29

the prospect of disputed factual issues that would render Plaintiff's motion premature.

## IV.  <u>CONCLUSION</u>

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Plaintiff's March 21, 2012

motion for judgment on the pleadings (docket #33) is GRANTED.  In light of this ruling,

IT IS FURTHER ORDERED that Plaintiff's March 21, 2012 motion to stay discovery

(docket #34) is DENIED AS MOOT, and that Defendant's April 24, 2012 motion to

compel discovery (docket #42) also is DENIED AS MOOT.  Finally, IT IS FURTHER

ORDERED that Defendant's April 26, 2012 motion for leave to file a surreply (docket

#43) is DENIED.

<u>s/Gerald E. Rosen</u>
Chief Judge, United States District Court

Dated:  March 13, 2013

I hereby certify that a copy of the foregoing document was served upon the parties and/or
counsel of record on March 13, 2013, by electronic and/or ordinary mail.

<u>s/Julie Owens</u>
Case Manager, (313) 234-5135